Mrs. Manuel Martinez (Formerly Mrs. Isabelle Diffendall) v. Commissioner. Charles A. Diffendall and Isabelle Diffendall v. Commissioner. Charles A. Diffendall v. Commissioner.
Martinez v. Commissioner
Docket Nos. 21227-21229.
United States Tax Court
T.C. Memo 1955-162; 1955 Tax Ct. Memo LEXIS 174; 14 T.C.M. (CCH) 606; T.C.M. (RIA) 55162; June 23, 1955
*174 1. The respondent determined the petitioners' taxable net income for each of the years 1942 to 1946, inclusive, by the net worth plus expenditures method. Held, the use of the net worth plus expenditures method is approved. Held, further, the petitioners' taxable net income for each of the years 1942 to 1946, inclusive, determined. Held, further, on the facts, the petitioners possessed cash in the amount of $12,500 on December 31, 1941, and in the amount of $16,000 on December 31, 1946; they altered or constructed 5 buildings in 1945 and 1946 at a total cost, as of December 31, 1946, of $33,500; they owned a supply of corrugated metal on December 31, 1946, which had a cost of $2,504.94; they had liabilities on December 31, 1946, in the total amount of $11,163.13; they realized long-term capital gain in 1946 in the amount of $20,000 upon the sale of the assets of their used car and parts business; they did not receive from Isabelle's mother any part of the sum of $20,831.78 which they paid in 1944 as premiums on a policy of life insurance. 2. Held, on the facts, no part of the deficiencies for the years 1942 or 1943 was due to fraud with intent to evade tax. Held, further, on the *175 facts, the respondent's determination of fraud penalties for each of the years 1944, 1945, and 1946, is approved. 3. Held, the deficiencies for the years 1942 and 1943 are barred by the statute of limitations. John Grason Turnbull, Esq., and R. Carleton Sharretts, Jr., Esq., for the petitioners. William Schwerdtfeger, Esq., for the respondent. HARRON Memorandum *176 Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax and penalties under section 293(b) of the Internal Revenue Code of 1939, as follows: Proceeding
Year
Deficiency
Sec. 293(b)
#21227
1945
$10,687.50
$ 5,343.75
Mrs. Manuel Martinez (formerly Mrs. Isa-
belle Diffendall)
1946
25,255.81
12,627.91
#21228
1942
412.26
206.13
Charles A. Diffendall and Isabelle Diffen-
dall (now Mrs. Manuel Martinez)
1943
1,436.71
718.36
1944
33,904.36
16,952.18
#21229
1945
10,534.73
5,267.37
Charles A. Diffendall
1946
25,436.45
12,718.23
In his answers, the respondent affirmatively alleged deficiencies in tax and penalties for 1946 in Docket Number 21227 in the amounts of $26,450.19 and $13,225.10, respectively, and in Docket Number 21229 in the amounts of $26,630.83 and $13,315.42, respectively. The petitioners assert that they have made overpayments of tax in each of the taxable years. The respondent recomputed the petitioners' net income by use of the net worth method. Although the petitioners challenge the use of the net worth method, they have not contested certain items appearing in respondent's *177 net worth statement, and several other items in the net worth statement have been agreed to by the parties, or conceded by the respondent. The issues to be decided are as follows: (1) Whether the petitioners had $85,000 in cash on hand at the beginning of the taxable period. The petitioners were given credit for no cash on hand at the beginning of the taxable period in the respondent's net worth statement. (2) Whether any part of the funds used by Isabelle Diffendall in 1944 to pay a life insurance premium in the amount of $20,831.78 was received by her from her mother. (3) The cost incurred by petitioners in 1945 and 1946 in the construction or alteration of 5 buildings. (4) Whether any part of the gain realized by the petitioners from the sale of their auto parts business in December 1946 constituted capital gain. (5) Whether the taxpayers had only $5,000 in cash on hand as of December 31, 1946, as petitioners contend, or $20,000 as the respondent has determined in his net worth statement. (6) Whether petitioners' living expenses for each of the taxable years amounted to $1,300 per year, as claimed by the petitioners, or $2,600 per year, as determined by the respondent *178 in his net worth statement. (7) Whether it is proper for the respondent to resort to the increase in net worth plus expenditures method of determining the taxable net income of the petitioners for the years 1942-1946, inclusive. (8) Whether all or any part of a deficiency is due to fraud with intent to evade tax under section 293(b) of the 1939 Code. (9) Whether the deficiencies determined by the respondent for 1942 and 1943 are barred by the statute of limitations. Findings of Fact The facts which have been stipulated are found accordingly. The stipulation of facts and the attached exhibits are incorporated by this reference. The petitioners are residents of Maryland and filed returns for the taxable years with the collector for the district of Maryland. The petitioners were married during the taxable years. They filed joint returns for 1942, 1943, and 1944. Individual returns were filed for 1945 and 1946. In 1948, they were divorced. During the taxable years the petitioners were partners in a business known as Forrest Auto Parts (sometimes hereinafter referred to as Forrest). Forrest was engaged in the business of buying wrecked automobiles and selling automobile parts. *179 Forrest also purchased and sold new automobile parts and cars which could be repaired for further use. In addition, the petitioners, as partners, owned rental real estate and operated a piece of property known as "Diffendall Airport." In 1946, Isabelle also acquired a beauty salon. Issue 1. - Propriety of Use of the Net Worth Method The only records kept by the petitioners consisted of a yearly book in which the "day's take" and expenses were recorded. Petitioners' sales were almost exclusively for cash, and only one amount, representing a total for the day, was entered in the book. There were no cash register tapes or other documents to substantiate the amount entered as the "day's take." The petitioners used cash from sales for their personal expenses. The books contained no cash account nor did they provide a way of reconciling any cash in the bank or on hand; no accounts were kept to reflect inventory, depreciation, accounts receivable, liabilities, or the petitioners' withdrawals. The petitioners kept no vouchers, receipts, or invoices, and they produced checks only for the year 1943 and for the month of October 1945. The book kept by the petitioners did not adequately reflect *180 the operations of their businesses or their income. The petitioners' net income for the taxable years, as reported, and as determined by the respondent, and the amounts constituting understatements of income, as determined by respondent, are as follows: Net Income
Net Income
Understatement
Determined by
Reported by
Determined by
Year
Respondent
Petitioners
Respondent
1942
$ 8,623.91
$ 7,149.67
$ 1,474.24
1943
11,086.20
6,677.03
4,409.17
1944
62,768.58
11,724.85
51,043.73
1945 Diffendall
29,423.62
9,596.28
19,827.34
Isabelle
28,969.24
9,141.90
19,827.34
Total
$ 58,392.86
$18,738.18
$39,654.68
1946 Diffendall
59,331.85 [1]
18,937.34
40,394.51
Isabelle
57,571.26 [1]
17,176.74
40,394.52
Total
$116,903.11 [1]
$36,114.08
$80,789.03
The respondent determined the petitioners' net income by means of the following net worth statement: ASSETS
12-31-41
12-31-42
12-31-43
12-31-44
12-31-45
12-31-46
Bank accounts, bonds, and
mortgages
$ 8,640.05
$10,071.83
$12,917.88
$15,319.30
$ 17,121.06
$ 74,201.78
Land (rental, farm, and air-
port)
1,230.00
1,230.00
1,230.00
11,591.96
44,140.69
44,140.69
Forrest - land, equipment, and
inventory
21,767.45
20,517.45
22,507.45
23,567.45
22,067.45
8,157.45
Waverly Beauty Salon
3,460.00
Automobile
1,518.51
Aeronco airplane
500.00
500.00
500.00
500.00
500.00
Cash on hand
20,000.00
Improvements - airport
10,000.00
38,500.00
Improvements - farm
22,000.00
22,000.00
18,000.00
Improvements - rental prop-
erty
6,200.00
6,200.00
6,200.00
6,200.00
6,200.00
19,200.00
Improvements - Forrest
6,000.00
6,000.00
6,000.00
6,000.00
6,000.00
6,000.00
Additional improvements -
Forrest
2,000.00
2,000.00
Metal supply
Total assets
$43,837.50
$44,519.28
$49,355.33
$85,178.71
$130,029.20
$252,520.68
LIABILITIES AND RESERVES
H.O.L.C. mortgage
$ 2,727.76
$ 2,576.27
$ 2,421.03
Reserve for dep.
604.00
1,943.00
3,722.00
$ 5,631.00
$ 7,870.00
$ 8,952.76
Accounts payable
15,584.86
Total liabilities and reserves
$ 3,331.76
$ 4,519.27
$ 6,143.03
$ 5,631.00
$ 7,870.00
$ 24,537.62
Net worth
$40,505.74
$40,000.01
$43,212.30
$79,547.71
$122,159.20
$227,983.06
Net worth prior year
40,505.74
40,000.01
43,212.30
79,547.71
122,159.20
Increase in net worth
$ (505.73)
$ 3,212.29
$36,335.41
$ 42,611.49
$105,823.86
U.S. income taxes paid
4,438.94
1,126.91
318.89
4,968.19
5,574.94
Ins. premiums paid
1,943.85
1,941.25
21,570.28
735.85
737.30
Living exp.
2,746.85
4,805.75
5,044.00
11,077.33
11,819.55
Fire loss
(6,052.54)
Standard deduction
(500.00)
(1,000.00)
(1,000.00)
Deduction for long-term cap-
ital gain
Corrected net income
$ 8,623.91
$11,086.20
$62,768.58
$ 58,392.86
$116,903.11
Net income per return
7,149.67
6,677.03
11,724.85
18,738.18 *
36,114.08 *
Unreported income
$ 1,474.24
$ 4,409.17
$51,043.73
$ 39,654.68 *
$ 80,789.03 *
*181 Petitioners had bank accounts in addition to those shown in respondent's net worth statement in which there were balances at the end of each of the years 1941-1946, as are shown below, so that their total bank account balances at the end of the years covered by the net worth statement were as follows: End of
Per
Additional
Total Bank
Year
N.W.S.
Bank Bal.
Balances
1941
$ 4,940.05
$1,816.17
$ 6,756.22
1942
1,141.83
1,834.17
2,976.00
1943
612.88
1,861.69
2,474.57
1944
2,264.30
1,847.89
4,112.19
1945
4,066.06
902.93
4,968.99
1946
59,146.78
211.18
59,357.96
In 1938, the petitioners erected a building on the Forrest premises at a cost of $4,251.25. This building was in existence and was owned by petitioners on December 31, 1946. Issue *182 2. - Cash on Hand on December 31, 1941 The petitioners were married in 1930, at which time Diffendall was approximately 21 years of age and Isabelle was between 18 and 19. Isabelle had completed approximately six years of school and Diffendall approximately four. Diffendall at the present time has a very limited ability to read; he has an extremely limited knowledge of the meaning of words; he reads with great difficulty. At the time of their marriage and for approximately one year thereafter, Diffendall was employed at the Sparrow's Point plant of the Bethlehem Steel Corporation at wages of approximately $30 to $40 per week. Isabelle had been employed prior to marriage as a hat trimmer, press feeder, machine operator, and clerk, and after marrying Diffendall she worked for a time as a waitress. Isabelle had been married previously. Her first husband was killed in an automobile accident in 1929. Within a year after they were married, the petitioners bought Forrest, a junk business located at Harford Road and Ashland Avenue, Baltimore, from Isabelle's father. They paid between $300 and $350 for this business. After about one year at the Harford site, they moved Forrest to the 900 *183 block of Greenmount Avenue, Baltimore. At the end of another year they transferred their business to 1017 Greenmount Avenue, where they remained for about four or five years, until 1937 or 1938. Their first son, Edward, was born in 1931, and during the first years of their marriage, the petitioners lived at a number of different locations. In 1933, they moved to 1017 Greenmount Avenue, where they occupied a 2-room flat, having one room downstairs and another room and bath upstairs. The upstairs room was located over the junk shop, and was heated with coal and oil stoves. Windows in the flat were broken, and various automobile parts were stored in the petitioners' living quarters. Both petitioners worked long hours at Forrest, and they had a relatively low standard of living during the period 1930 to 1937. In 1936 petitioners acquired land at 8112 Eastern Avenue, Baltimore, at a cost of $5,557.45, and in 1938 they erected a building on the premises at a cost of $4,251.25. During 1938, they moved Forrest to 8112 Eastern Avenue, where it was located until December 1946. In 1941, a second son, Charles, Jr., was born. In the same year, the petitioners acquired the real property at 8114 *184 Eastern Avenue, adjoining the Forrest premises, for $3,500, and lived in a house at 8114 Eastern Avenue throughout the taxable years. The petitioners filed no income tax returns for the years 1930 to 1936, inclusive. They filed income tax returns for the years 1937 to 1941, and reported net income as follows: Year
Amount
1937
$ 3,405.45
1938
4,199.91
1939
5,410.98
1940
4,443.76
1941
20,093.09
Total
$37,553.19
During the years 1937 to 1941, the petitioners paid income taxes in the following amounts: Income Taxes
Year
Paid
1937
1938
$ 8.22
1939
40.00
1940
88.43
1941
76.72
Total
$213.37
During the years 1937 to 1941, the petitioners purchased the following property for cash and liquidated the following liabilities: 1937 to 1939
Purchase money mortgage on 8112
Eastern Avenue - paid
$ 3,500.00
1937 to 1941
Construction mortgage of
$4,000 to Bradford Sav-
ings and Loan Association
- paid
$4,000.00
United States Bonds pur-
chased
3,500.00
7,500.00
1938
Construction of building at 8112
Eastern Avenue
4,251.25
1941
Purchase of Harford Ave-
nue real estate
$ 130.00
Purchase of 8114 Eastern
Avenue real estate
3,500.00
Purchase of Oriole Avenue
real estate
3,800.00
Purchase of tow truck
1,600.00
Purchase of automobile
1,200.00
Reduction of indebtedness
to H.O.L.C.
62.24
10,292.24
Total
$25,543.49
*185 During the period from December 31, 1936 to December 31, 1941, the petitioners paid $703.44 interest on debts. Also, they used $1,888.90, which they withdrew from their bank account at the Maryland Trust Company, plus $79.95, the amount by which they overdrew the account. On October 25, 1941, the petitioners deposited $8,323.93, cash, in their bank account. The deposit was made to cover a check of $8,500 which had been drawn against the account to pay for automobiles and parts. Beginning sometime prior to December 31, 1941, the petitioners followed the practice of exchanging currency in denominations of $20 or under, which they had received in the course of their business operations, for bills of larger denominations. These exchanges were carried out at the Old Town Office of the Maryland Trust Company. The amounts exchanged by the petitioners and the frequency of the exchanges varied. Some of the larger denomination bills received by the petitioners in the exchanges were kept in their safety-deposit box, and most were kept in safes at 8112 Eastern Avenue. Diffendall had dug a safe in the chimney at 8112 Eastern Avenue as soon as the petitioners occupied the premises. Within *186 6 months thereafter, the petitioners acquired a small safe on which they obtained the maximum amount of insurance coverage against theft, namely, $2,000. Sometime in the 1940's they bought a larger safe on which they were able to obtain $10,000 insurance coverage. They were advised that they could obtain an additional $10,000 coverage if a metal chest was electrowelded into the safe, but they never inserted such a chest or obtained the additional available coverage. Beginning sometime in 1943 and continuing until sometime in 1944, Isabelle compiled a list of the serial numbers of the bills in denominations of $50, $100, $500, and $1,000 which were held by the petitioners. The bills on this list had a total value of $62,150. None of the bills represented by the listed serial numbers were gold Federal Reserve Notes of the 1928 series, which had a yellowish tint and gold seals and serial numbers. The bills were all of the next series, that of 1934, and no more than $8,250 worth of the bills had been issued to the Federal Reserve Banks for circulation prior to January 1, 1942. On December 13, 1948, Diffendall executed an affidavit in which he stated that the petitioners counted their *187 cash on June 29, 1938, and that they had either $50,000 or $55,000 on that date. Diffendall was placed in Class 3 or Class 3-A by his Selective Service Board on June 4, 1941. Thereafter he was reclassified and placed in Class 1 or 1-A only during the following periods: December 7, 1943 to December 13, 1943; January 18, 1945 to February 3, 1945; and February 23, 1945 to March 3, 1945. At all other times through October 1, 1945, he was classified in categories 2-A, 3 or 3-A, or 4-A. The petitioners rented a safety-deposit box at the Union Trust Company of Maryland, Baltimore in 1934. They did not visit this safety-deposit box from July 29, 1941 to May 31, 1944. On December 31, 1941, the petitioners had cash on hand from accumulated earnings of their business which did not exceed $12,500 in amount. This cash was expended as follows: $1,000 in 1943; $4,500 in 1944; $4,000 in 1945; and $3,000 in 1946. On June 30, 1929, Isabelle's first husband, John Franklin Lowe, was killed in an automobile accident while operating a motorcycle. On November 2, 1929, a suit growing out of Lowe's death was settled by the payment to Isabelle's mother, as Isabelle's next friend, of $2,200, and of an *188 additional $2,000 to the mother as the next friend of Isabelle's infant daughter. Diffendall never saw any money, if any, which Isabelle might have received as a result of the 1929 automobile accident, and he did not know whether or how she may have spent the money, if she received any money. None of the cash spent by the taxpayers during the taxable years consisted of gold notes of the 1928 series, possession of which was unlawful under the provisions of Executive Order No. 6260, dated August 28, 1933. On December 31, 1941, Isabelle did not have on hand any cash which she might have received in 1929 as a result of the death of her first husband. Issue 3. - Funds Used for Life Insurance Premium Prepayment in 1944 In 1940, the petitioners took out a $20,000 life insurance policy on Diffendall's life. The policy provided for retirement income at age 55. The petitioners paid the annual premiums from 1940 to 1943, inclusive. In 1944 Isabelle prepaid the balance of the premiums on the policy. The amount of the prepayment was $20,831.78, and Isabelle paid this amount in cash to the insurance agent, Meyer A. Goldstein, on August 7 or 8, 1944. No part of the $20,831.78 in cash used *189 to prepay the premiums on Diffendall's policy in August 1944 was given to Isabelle or Diffendall by Isabelle's mother. Issue 4. - Cost of Buildings Constructed in 1945 and 1946 In 1945 and 1946, the petitioners started the construction or alteration of 5 buildings on land owned by them. The date of acquisition and the basis for depreciation reported in petitioners' returns for 1946 for each of the buildings, are as follows: Reported
Basis
Reported
for Depre-
Date of
Structure
ciation
Acquisition
1. Addition at 8112 Eastern
Avenue
$ 2,000
12/45
2. 8130 Eastern Avenue
15,000
6/1/46
3. Airport Hangar
8,000
7/1/46
4. Airport Administration
Building
20,000
10/1/46
5. Airport Beach House
2,500
7/1/46
The hangar and administration building at the airport were not completed until after December 31, 1946. On January 20, 1948, Diffendall executed an affidavit for respondent's agents in which he stated that the cost of the 5 buildings was as follows: "addition" at 8112 Eastern Avenue, $2,000; 8130 Eastern Avenue, $13,000; airport hangar, $6,000; airport administration building, $20,000; and beach house, $2,500. At the time Diffendall *190 executed the affidavit referred to above, he did not understand accounting procedures or the net worth plus expenditures method of determining taxable net income. His attorney, Samuel Kimmel, had been a member of the Maryland bar since about 1934, and he generally understood the net worth method and the importance of "cost" of assets as used in a net worth statement. There was a shortage of some building materials in 1945 and 1946. The 5 structures were built without the authorization and priorities required by Veteran's Housing Program Order No. 1 (as amended August 27, 1946, 11 F.R. 9515, and June 1, 1947, 12 F.R. 3611), promulgated pursuant to the Veteran's Emergency Housing Act, 60 Stat. 207. The construction work was performed in large part by Diffendall and by persons whose wages were paid by Forrest. The cost to the petitioners of each of the 5 buildings, as of December 31, 1946, was as follows: Cost to
Petitioners
as of
Building
12-31-46
1. Addition at 8112 Eastern Avenue
$ 750
2. Building at 8130 Eastern Avenue
11,000
3. Hangar at Airport
4,000
4. Administration Building at Airport
17,000
5. Beachhouse at Airport
750
*191 The total cost to the petitioners, as of December 31, 1946, of all of the improvements at the airport, including the hangar, administration building, beach house, and certain other structures, was $31,750. The total cost to the petitioners, as of December 31, 1946, of the improvements on their rental properties, namely, 8114 Eastern Avenue, 8130 Eastern Avenue, and 420 Oriole Avenue, was $17,200. On December 31, 1946, the petitioners' liabilities did not exceed $11,163.13. Of this amount, liabilities for construction materials utilized in the buildings and reflected in the cost of the buildings as of that date, did not exceed $9,484.88. The balance of the liabilities, namely, $1,678.25, was owed by petitioners for a quantity of corrugated metal purchased during 1946. The corrugated metal referred to above was purchased by the petitioners at a total cost of $2,504.94. This metal was not used by the petitioners in their construction work during 1946. Diffendall used part of this metal in the construction of additional buildings after 1946; he sold part in 1951, and he still owned part at the time of the hearing. On December 31, 1946, the petitioners owned a supply of corrugated *192 metal having a cost of $2,504.94. The following liabilities in the total amount of $4,421.73 were not incurred by the petitioners until after 1946: $1,286.50 for a cocktail bar and furniture; $1,460.85 for cement; and $1,674.38 for additional sheet metal. These materials and fixtures were not assets of the petitioners on December 31, 1946. In 1946, petitioners purchased 2 Caterpillar tractors and a LeTourneau scoop at a total cost of $15,715.25. This equipment was purchased for use at the "Airport", and was owned by the petitioners on December 31, 1946. Issue 5. - Capital Gain on Sale of Forrest in December 1946 On December 4, 1946, the petitioners sold all the assets of Forrest, with certain minor exceptions not here material, to Gittings Auto Parts, Inc., (hereinafter referred to as Gittings), a Maryland corporation. The selling price was $85,000, of which $20,000 was paid in cash to the petitioners on the same day. Gittings was owned and operated by the family of Jacob S. Shapiro, which also controlled several scrap metal enterprises in the Baltimore area. The Agreement of Sale with Gittings described the property sold as follows: * * *
"(1) All fixtures, equipment, *193 stock, chattels, new and used automotive parts of every kind, character and description * * *
"(2) Also, all derricks, cranes, machinery and mechanical equipment now used or of use in the aforementioned business, as well as all office furniture and fixtures, the cash register, filing cabinets, etc. "(3) The good-will of said business and all and everything now located on said premises and not specifically enumerated. * * *
"It being the intention of the aforesaid Vendors to sell to the said Vendee all of the machinery, equipment, stock in trade, and assets of every character and description belonging to the aforesaid business 'FORREST AUTO PARTS.'" The agreement required the petitioners, inter alia, to lease to Gittings the premises at 8112 Eastern Avenue, upon which Forrest was located. The lease was to be for a term of 5 years, with an option to renew for 5 additional years, at an annual rental of $5,000; it was to provide that Gittings would have the exclusive right during the lease to a neon sign on the premises which read "Forrest Auto Parts." The sales agreement also provided that Gittings would have the exclusive use of Forrest's trade name as long as Gittings *194 or its assigns occupied the premises; the petitioners covenanted that they would not engage in a similar business within 3 miles of Forrest during the period of the lease. The sales agreement did not allocate the purchase price among the machinery and equipment, inventory, goodwill, agreement to lease, and the covenant not to compete, and the transaction was not reflected upon petitioners' books. The machinery and equipment used in Forrest's business had an adjusted basis of $5,823.45, and no more than $5,823.45 was paid by Gittings for these assets. The petitioners incurred expenses of $2,800 in connection with the sale. Prior to the sale, Shapiro had made several unsuccessful attempts to purchase the scrap metal on Forrest's premises. Forrest accumulated scrap metal from broken auto parts and from automobiles from which all the saleable parts had been stripped. Prior to the execution of the sales contract, Shapiro did not inquire about Forrest's earnings, nor did he ask to inspect petitioner's books. However, he did make a visual inspection of the premises. In addition to the amounts he was willing to pay for the auto parts and reusable cars, Shapiro was willing to $30pay per *195 ton for the loose scrap on the Forrest premises and about $20 for the scrap remaining on a car after the saleable parts were removed. After Gittings purchased Forrest's business, all the cars and loose scrap were removed to the United Iron and Metal Co., a scrap metal enterprise controlled by Shapiro. The automobiles capable of reuse were removed, also. In August 1947, after the removal of the scrap metal and automobiles from the Forrest premises, Gittings resold Forrest to the petitioners for $35,000. At the time of the resale, the machinery and equipment involved in the original sale were still on hand at Forrest, as well as an undisclosed quantity of auto parts. In the partnership return of Forrest for 1946, the sale of the business was reported in the following way: Gross Sales Price
$85,000
Cost on other basis of property sold
$20,323.45
Expenses of Sale
2,800.00
$23,123.45
Long-term Capital Gain
61,876.55 taxation, namely, $30,938.27. The petitioners' computation, as set forth above, was made on the assumption that the adjusted bases of Forrest's equipment and inventory amounted to $5,823.45 and $14,500, respectively, or a total of $20,323.45, *196 and that these items were sold for no more than their adjusted bases. The petitioners treated the difference between $85,000 and $20,323.45, namely, $64,676.53, as payment by Gittings for the goodwill of Forrest. The respondent determined that no part of the purchase price of $85,000 was paid by Gittings for Forrest's good will. In respondent's view, Gittings paid no more than the adjusted basis, $5,823.45, for Forrest's equipment, and no less than $79,176.55, the balance of the purchase price, for Forrest's inventory. The respondent further determined that whatever gain Forrest realized on the sale of its inventory for $79,176.55 was ordinary gain and not capital gain. Accordingly, in determining the petitioners' net income for 1946, the respondent did not allow any long-term capital gain deduction from petitioners' 1946 increase in net worth. The purchase price paid by Gittings for the business and assets of Forrest, $85,000, represented payment of no less than $65,000 for tangible assets, and no more than $20,000 for goodwill. The petitioners realized long-term capital gain of $20,000 upon the sale of Forrest's assets to Gittings in 1946. Issue 6. - Cash on Hand on December 31, 1946 *197 The petitioners were paid $20,000 in cash on December 4, 1946, as part of the $85,000 purchase price for Forrest. The next day, December 5, 1946, Isabelle visited the petitioners' safety-deposit box at the Union Trust Company. During December 1946, Diffendall made the following cash payments to creditors: Creditor
Date
Amount
George W. Boring
12- 7-46
$ 962.00
Harry T. Campbell
12- 9-46
54.60
American Welding Company
12-13-46
36.00
O'Connor Lumber Co.
12-13-46
106.40
B. C. Mathis
12-16-46
771.60
Max J. J. Klemm
12-27-46
500.00
United Iron & Metal
12-27-46
400.00
Atlantic Mill & Lumber Co.
12-28-46
200.00
Total
$3,030.60
The petitioners made the following payments by check during December 1946: Auto Glass Replacements
$ 553.15
Baltimore County
913.45
Total
$1,466.60
On August 9, 1947, the petitioners contracted to repurchase Forrest from Gittings for $35,000, of which amount they were to pay $15,000 down. On August 11, 1947, Isabelle visited the safety-deposit box at the Union Trust Company for the first time since December 5, 1946. Also, on August 11, 1947, a total of $16,000 in cash was deposited to the *198 petitioners' bank account. A check in the amount of $15,000 cleared the account on the following day. The petitioners had $16,000 in undeposited cash on hand on December 31, 1946. Issue 7. - Living Expenses The petitioners had two children, Edward, born in 1931, and Charles, Jr., born in 1941. In October 1946, Charles, Jr. died. The Diffendall family lived together during the taxable years. The petitioners' expenditures for living expenses amounted to $2,600 per year. In addition, the petitioners spent for clothing, household appliances, tuition, jewelry, and a fur coat, the amounts set forth in the following table. The petitioners' expenditures for living and general expenses amounted to $2,746.85 in 1942; $4,805.75 in 1943; $5,044 in 1944; $11,077.33 in 1945; and $11,819.55 in 1946: Item
1942
1943
1944
1945
1946
Cost of living
$2,600.00
$2,600.00
$2,600.00
$ 2,600.00
$ 2,600.00
Clothing
146.85
730.75
1,344.00
3,803.65
3,646.05
Clothing and household
1,100.00
471.68
575.75
Appliances
281.75
Children's tuition
202.00
876.00
Bracelet
4,000.00
Misc. jewelry
1,475.00
Coat
3,840.00
Total
$2,746.85
$4,805.75
$5,044.00
$11,077.33
$11,819.55
*199 As of December 31, 1945, the petitioners had improvements located on their farm which had a cost or basis of $22,000. In June 1946, the improvements were damaged by fire. The amount of the damage was $6,500. The improvements were insured, and the petitioners recovered $6,500 through their insurance. They used, out of this recovery, only $2,500 to partially repair the damages. The remaining $4,000 was not expended in the acquisition of other property similar or related in service or use, or in the establishment of a replacement fund. The petitioners owned personal property which was damaged to the extent of $6,052.54 by the fire at the farm in June 1946. This property also was insured, and the petitioners recovered $4,718.63 of insurance. The petitioners' reserve for depreciation at the end of each of the years 1941 to 1946, inclusive, was as follows: 12/13/41
$ 464.08
12/31/42
1,768.10
12/31/43
3,512.12
12/31/44
5,342.81
12/31/45
7,546.83
12/31/46
8,154.37
The petitioners' taxable net income in each of the taxable years was not less than the following amounts: 1942
$ 8,676.89
1943
10,148.70
1944
58,333.09
1945 Diffendall
$26,343.63
Isabelle
25,889.25
52,232.88
1946 Diffendall
$49,248.42
Isabelle
47,487.83
96,736.25
*200 The taxable net income of the petitioners for the years 1942-1946, inclusive, was understated in their income tax returns by the amounts set forth in the following table: Understate-
Net Income
Correct
ment of
Year
per Returns
Net Income
Net Income
1942
$ 7,149.67
$ 8,676.89
$ 1,527.22
1943
6,677.03
10,148.70
3,471.67
1944
11,724.85
58,333.09
46,608.24
Charles Diffendall
1945
9,596.28
26,343.63
16,747.35
1946
18,937.34
49,248.42
30,311.08
Isabelle
1945
9,141.90
25,889.25
16,747.35
1946
17,176.74
47,487.83
30,311.09
Isabelle was indicted and tried in the United States District Court at Baltimore for wilfully attempting to evade and defeat her Federal income taxes for 1944, 1945, and 1946. She was acquitted on the counts relating to 1944 and 1945, but she was convicted on the counts relating to 1946. No part of the deficiencies for 1942 or 1943 was due to fraud with intent to evade tax. Part of the deficiency for each of the years 1944, 1945, and 1946, was due to fraud with intent to evade tax. The petitioners filed their returns for 1942 and 1943 on March 15, 1943, and March 15, 1944, respectively. The *201 respondent's statutory notice of deficiency for these years was mailed on September 27, 1948. The petitioners' return for 1943 reported, inter alia, the following items: Item
Amount
1. Items reported in Schedule C(2)
Profit (or Loss) from Business
or Profession [Forrest Auto
Parts]: (a) Total receipts (line 1)
$42,952.65
(b) Net cost of goods sold (line
9)
29,950.00
(c) Gross profit (line 10)
13,002.65
(d) Total other business deduc-
tions (line 19)
7,043.31
(e) Net profit (line 21)
5,959.34
2. Rents and royalties (page 1, line 7)
1,004.35
3. Total income (page 1, line 10)
6,963.69
Opinion The respondent determined that the petitioners did not have adequate accounting records which clearly reflected their income for the taxable years 1942 to 1946. Accordingly, under the provisions of section 41 of the Internal Revenue Code of 1939 he determined net income for each year by use of the annual increase in net worth plus expenditures method. The respondent's net worth statement showed that the petitioners must have realized taxable income in each of the years involved in amounts which exceeded the taxable income reported in their returns. The *202 respondent also determined a 50 per cent addition to tax for each year under the provisions of section 293(b) of the 1939 Code. In general, there is the broad question whether the petitioners realized taxable income in each of the taxable years in the amounts determined by the respondent, or in some other amount. Under this general issue, the petitioners have the burden of proof. With respect to the increases in deficiencies which the respondent claimed by his answers to the amended petitions, the respondent has the burden of proof. The respondent, also, has the burden of proving that all or a part of the deficiencies, if any, are due to fraud with intent to evade tax. Issue 1. - Propriety of Use of the Net Worth Method The petitioners, in their amended petitions allege that the income of Forrest for the years 1942 to 1946 was correctly stated in the partnership returns, and that taxable net income was correctly reported in each of their individual returns. The petitioners rely upon the correctness of their returns as filed, except for "differences as a result of technical adjustments which might be made thereto." At the beginning of the trial of these proceedings, the Court inquired *203 whether the petitioners did not keep "adequate and complete books and records during the taxable years" and petitioners' counsel stated that petitioners did not concede that their books were inadequate. We regard petitioners' pleadings as broad enough to raise the question whether respondent properly employed the net worth plus expenditures method. The Commissioner is authorized to employ an acceptable means of reconstructing a taxpayer's income where it is established that a taxpayer kept inadequate books and records. See section 41 of the 1939 Code. The net worth method is an acceptable method of reconstructing taxable income. The petitioners did not employ a bookkeeper or accountant. Such records as were maintained were set up and kept by the then Isabelle Diffendall (now Mrs. Martinez). The books were not balanced at the end of each year by closing out all accounts into a profit and loss statement. A double entry set of books was not maintained. The books did not contain any separate accounts for costs of operation, accounts payable, or accounts receivable. Other deficiencies in the records *204 have been set forth in the Findings of Fact and need not be repeated. In some of the taxable years the petitioners entered into various ventures involving the purchase of real estate and the construction of buildings. No books of account were kept for any of these ventures. The petitioners did not keep individual books of account. Although some receipts and canceled checks were retained, such material was incomplete and wholly inadequate. It is concluded that the petitioners have failed to keep and maintain adequate books and records for any of the taxable years, and that the respondent properly used the net worth plus expenditures method to compute taxable income. Frank Imburgia, 22 T.C. 1002; Estate of W. D. Bartlett, 22 T.C. 1228. Moreover, the taxable income of the petitioners indicated by the net worth method is substantially greater than that reported in their returns and reflected on their books, and as such, "the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false." Morris Lipsitz, 21 T.C. 917, 931, *205 affd. 220 Fed. (2d) 871; Estate of W. D. Bartlett, supra. Although the petitioners have not conceded that the respondent properly used the net worth method, the parties have agreed that various items of assets and liabilities set forth in the net worth statement for each of the taxable years are correct. Most of the items agreed to are contained in the stipulation of the parties. Other items which are no longer in dispute have been set forth in the Findings of Fact. We turn now to a consideration of the questions relating to the disputed items of assets and liabilities contained in the respondent's net worth statement. Issue 2. - Cash on hand on December 31, 1941 The petitioners were given no credit in respondent's net worth statement for undeposited cash on hand as of December 31, 1941. The petitioners claim that they counted their money shortly after the attack on Pearl Harbor, when Diffendall was reclassified into category 1-A by his Selective Service Board, and that they had approximately $85,000 in undeposited cash on December 31, 1941. The petitioners assert that this cash consisted of $70,000 or $75,000 from accumulated earnings of Forrest *206 and of approximately $15,000 which Isabelle had collected in 1929 as a result of the death of her first husband (hereinafter referred to as Isabelle's "personal" money). The petitioners claim that part of their accumulated Forrest earnings and Isabelle's personal money was kept in a safety-deposit box, and that the balance of their earnings was located in safes at 8112 Eastern Avenue. We shall consider the accumulated earnings and Isabelle's personal money separately. The evidence indicates that the petitioners had cash on hand, in unknown amounts, prior to the taxable years, and that they dealt extensively in cash. Other than their own testimony, however, the record does not support their contention as to the amount of cash on hand on December 31, 1941. On the contrary, the evidence indicates that they had only a small fraction of the claimed amount on hand on that date. The petitioners started Forrest in 1930 or 1931, and filed their first tax returns for the year 1937. They reported net income for the years 1937 through 1941 in the total amount of $37,553.19. During the same period they made nondeductible expenditures, other than for living expenses, in the amount of $34,080.79. *207 The balance in their bank account, a source of funds for these expenditures, decreased a total of $1,968.85 in this period. When we also take into account the petitioners' living expenses for this five-year period, it appears doubtful that the petitioners managed to save much cash as of December 31, 1941, from their earnings during the period 1937 to 1941, inclusive. In the face of this evidence, we cannot accept petitioners' testimony that their cash on hand from Forrest earnings increased by approximately $30,000 between the end of 1936 and June 28, 1938, and by another $25,000 to $30,000 between June 28, 1938, and December 31, 1941. The petitioners claim that they had cash of $20,000 or more at the end of 1936 from accumulated Forrest earnings, but have made no attempt to corroborate their own testimony in this regard. They filed no returns for 1936 or prior years, and it is impossible to determine from the record how much cash they possessed as of December 31, 1936. Diffendall testified that the petitioners were unable to accumulate any earnings from their first year in business, and the petitioners do not claim that their earnings during the years 1931 to 1936, inclusive, were *208 any greater than during the years immediately following, for which they filed returns. Petitioners rely to a great extent on a list of serial numbers of Federal Reserve Notes in denominations of $50, $100, $500, and $1,000, which is contained in their book for 1943. The listed bills aggregate $62,150, and both petitioners testified that these notes represented cash on hand as of December 31, 1941. Isabelle testified that the listing, which was started in 1943 and completed in 1944, was occasioned by information the petitioners received to the effect that the Government would replace any lost or destroyed bills which could be identified by serial numbers. We have found that the bills represented by the serial numbers were not gold notes, the possession of which had been proscribed by Executive Order 6260, dated August 28, 1933. The petitioners would not testify that any of the notes were gold, and they could not recall if any comment was ever made to them in the years 1944 to 1946, the period of their large expenditures, about illegal circulation of gold currency. The serial numbers were of the series of 1934 "green" Federal Reserve Notes which were issued after the withdrawal of *209 the gold notes, and the respondent's evidence established that no more than $8,250 of bills with the listed serial numbers had been released to the Federal Reserve Banks for public circulation prior to December 31, 1941. The petitioners contend that they obtained the listed notes in exchanges for currency of smaller denominations which they received in the course of their operations at Forrest. They testified that these exchanges were carried out at irregular intervals and for varying amounts, but that it generally was their practice to make the exchanges at least as often as accumulations of small bills filled the safes at 8112 Eastern Avenue; and that these exchanges started well before the taxable period and continued until about the middle of 1944. Although the contention is by no means clear from their testimony, the petitioners claim on brief that another part of the listed bills, namely, approximately 280 $100 bills, or $28,000, was obtained in 1944 in exchange for small denomination bills which had been stored in their safety-deposit box since 1941. These 280 bills constitute all of the $100 bills on petitioners' list which were released for circulation during and after May *210 1944. The petitioners rely on bank records which show that they did not enter their safety-deposit box between July 29, 1941 and May 23, 1944. It is therefore true that any cash in the safety-deposit box on May 23, 1944 would also have been on hand on December 31, 1941. The difficulty with petitioners' claim, however, is that the evidence does not establish the amount of small bills, if any, which they had in the safety-deposit box on May 23, 1944. The petitioners made no attempt to prove the contents of their safety-deposit box. The receipt of the $100 bills in May 1944, and thereafter, is equally consistent with exchanges of small bills from current earnings, inasmuch as the petitioners continued to make currency exchanges during 1942, 1943, and prior to May 23 in 1944. We cannot determine which part, if any, of the $100 bills released for circulation in May 1944, and thereafter, was received in exchange for small bills taken from the safety-deposit box, as distinguished from small bills received in 1944 in the course of the petitioners' business. Furthermore, the existence of any large amount of small bills in the safety-deposit box from July 29, 1941 to May 23, 1944, conflicts *211 with the petitioners' testimony that they generally exchanged the small bills at least as often as their safes were filled. There are additional factors which negate petitioners' claim to extensive cash holdings on December 31, 1941. The petitioners had a small safe at 8112 Eastern Avenue on which they had obtained the maximum insurance, $2,000. They did not get a larger safe until sometime in the "1940's" at the suggestion of their insurance agent, at which time they obtained coverage in the amount of $10,000. They were informed that additional coverage of $10,000 could be obtained if an electrowelded chest was inserted in the safe, but they never acted upon this offer for additional coverage. The petitioners' claim is also inconsonant with their low standard of living prior to December 31, 1941. The evidence reveals that only in 1944 and thereafter did the petitioners begin making substantial expenditures for clothing, jewelry, and insurance. We also have grave doubts that the petitioners counted their cash at any time near December 31, 1941, as they claimed. They testified that the counting was stimulated by Diffendall's reclassification into category 1-A by his Selective Service *212 Board. Isabelle testified that Diffendall previously had been classified and deferred 2 or 3 times, and that his reclassification to category 1-A occurred shortly after the attack on Pearl Harbor on December 7, 1941. Diffendall's Selective Service Questionnaire, however, indicates that he registered with his Selective Service Board in June 1941; that he was placed in class 3 on June 4, 1941, and that he remained in class 3 or 3-A without any further action or reclassification until December 1943; and that the only times he was reclassified to class 1 or 1-A were for short periods in December 1943, and in January, February, and March 1945. In view of the foregoing we are unable to accept petitioners' testimony that they had more than $70,000 in cash from accumulated earnings on December 31, 1941. We have carefully reviewed the record and have found as a fact that petitioners' cash on hand on December 31, 1941, did not exceed $12,500, and they should be given credit for this amount in the respondent's net worth statement. The evidence does not provide any breakdown as to when this accumulated cash was spent, during the taxable years, other than the record of the petitioners' expenditures. *213 In the absence of other evidence to the contrary, we have treated this $12,500 as having been expended in approximately the same proportion as petitioners' total expenditures over the taxable years: $1,000 in 1943; $4,500 in 1944; $4,000 in 1945 and $3,000 in 1946. Cohan v. Commissioner, 39 Fed. (2d) 540. The second item of cash which the petitioners claim to have possessed on December 31, 1941, is the $15,000 or $17,000 allegedly received by Isabelle as a result of her first husband's death in 1929. She testified that she was given $4,200 which had been paid to her mother in settlement of a suit growing out of the death, and that she collected an additional $12,000 in insurance from unidentified insurers. Isabelle also testified that she kept this amount virtually intact, in cash, in an envelope in the safety-deposit box; that the cash was on hand on December 31, 1941; and that it was spent during the taxable years. We do not accept this contention, and we hold that respondent did not err in refusing to give the petitioners any credit for this "personal" money in his net worth statement. It is difficult to believe that any money Isabelle received in 1929 was kept *214 intact for more than 12 years. The hoarding of such a sum is inconsistent with the petitioners' low living standards during the 1930's, as set forth in our Findings of Fact. Even more persuasive of the nonexistence of this cache is the testimony of Diffendall, who stated that he had never seen any of this personal money. He also testified that he was unaware whether or how Isabelle might have spent these funds, although the expenditures for real and personal property during the taxable years certainly were matters within his cognizance. Petitioners' discharge of their burden of proving that they had cash holdings on December 31, 1941, and of proving the amount thereof, has not been advanced by the varying positions taken by the petitioners during the investigation of their tax returns by the respondent's agents, and in the course of their testimony in these proceedings. During the investigation of their returns, from about January to May 1948, the petitioners did not claim that, on December 31, 1941, they had cash on hand of $70,000 or $75,000 from accumlated earnings of Forrest. The largest amounts of cash they claimed to have had were $20,000 at the end of 1936, the last year for *215 which they filed no returns, and either $30,000 or $30,000 more at the end of 1941. The claim that petitioners had $70,000, or $75,000 was not asserted until the latter half of 1948, after the completion of the investigation and the submission of the agent's report. On December 13, 1948, Diffendall executed an affidavit in which he stated that the petitioners counted their cash on June 29, 1938, and that they had $50,000 or $55,000 on that date. At the trial of these proceedings, he testified that his best recollection was that they had $45,000 in cash on that date. Isabelle, on the other hand, testified that she believed they had more than $20,000 at the end of 1936, and $50,000 or $55,000 on June 29, 1938. The petitioners contend, and they ask the Court to find, that they had cash on hand as of December 31, 1941, in an amount which was not less than $85,000. The petitioners have failed to prove by competent and credible evidence that they had $85,000 in cash on hand as of December 31, 1941. Although the proof under this issue is unsatisfactory, unclear, and weak, we believe that it is reasonable to conclude that they had some cash savings as of December 31, 1941. Bearing heavily *216 upon the petitioners for their failure of proof, a condition which is of their own making, and giving as much weight to petitioners' testimony and efforts to meet their burden of proof as we deem proper upon the whole record, it is found and concluded that the petitioners had only $12,500 cash on hand as of December 31, 1941. The respondent has the burden of proving fraud as to all of the years involved. However, the respondent's burden of proof relates to the penalties under section 293(b), only, and as has been pointed out frequently, that burden of proof does not relieve the petitioners of the burden of disproving the correctness of the respondent's determinations of the amounts of taxable net income for each year. Petitioners must overcome "the presumption of correctness attaching to the Commissioner's finding of the amount of tax due." Max Cohen, 9 T.C. 1156, 1163, affirmed 176 Fed. (2d) 394. See, also, Snell Isle, Inc. v. Commissioner, 90 Fed. (2d) 481, certiorari denied 302 U.S. 734; Kenney v. Commissioner, 111 Fed. (2d) 374; *217 and Leonard B. Willits, 36 B.T.A. 294, 300. Issue 3. - Funds used for Life Insurance Premium Prepayment in 1944 On August 7 or 8, 1944, Isabelle paid $20,831.78 in cash to prepay the balance of the premiums on a life insurance policy on Diffendall's life. The petitioners claim that about $10,000 of the cash used to make the prepayment was received as an "investment" from Isabelle's mother, and, therefore, did not constitute taxable income. We have found as a fact that Isabelle's mother gave Isabelle no part of the $20,813.78 used to prepay the premiums, and our Finding is dispositive of this issue. We are not impressed with Isabelle's testimony that her mother "voluntarily invested" about $10,000 in the insurance policy. Her testimony constitutes the third different explanation offered by the petitioners on this matter. During the investigation by respondent's agents, no contention was made that any part of the funds originated with any relative of either of the petitioners. Moreover, we are satisfied that during the investigation Isabelle attempted to conceal the existence of this prepayment. At a conference with respondent's agents on February 6, 1948, at which *218 time petitioners were represented by an attorney and a certified public accountant, Isabelle answered the following questions under oath: "Q. Have you paid any single premium of prepaid life insurance on your life insurance or your husband's? A. We have a little life insurance but it is not enough to talk about. Q. Approximately how much? A. I don't know." Subsequently at the same conference respondent's agents presented to Isabelle a letter from the insurer which confirmed the premium prepayment, and Isabelle admitted she had made the prepayment, in cash. Sometime after the investigation was completed, the petitioners made the contention that the entire $20,831.78 was received from Isabelle's mother, Mary Brewer, who had obtained the money from life insurance proceeds on the life of a John W. Wiseman. The reply in docket number 21228, filed March 21, 1949, alleges that the $20,831.78 "was money which was received by petitioner, Isabelle Martinez, from her mother and was not taxable income." We likewise place little credence in the explanation offered by Isabelle for her mother's source of the funds. Isabelle testified that her mother received the money as insurance proceeds *219 on the life of one John W. Wiseman, who died in November 1937, and for whom the mother had at one time worked as a housekeeper. Isabelle could not identify the insurer nor did she know whether Wiseman or her mother had taken out the alleged policy. On the other hand, the records of the Monumental Life Insurance Company, which had written a series of small policies on Wiseman's life, indicated that Wiseman was a person of very modest means; that during his lifetime he had canceled or surrendered all but two policies having a total face amount of $1,500; that there were loans outstanding or premiums due on both of these policies; and that the total proceeds of $1,361.20 were paid to persons other than Isabelle's mother. Issue 4. - Cost of Buildings Constructed in 1945 and 1946 The question to be decided under this issue is whether the respondent correctly determined the costs incurred by the petitioners in 1945 and 1946 for the construction of 5 buildings on Eastern Avenue and at the airport. The respondent accepted as the cost of each building the basis for depreciation reported in the petitioners' returns for 1946, or the cost listed in Diffendall's affidavit of January 20, 1948, if *220 the latter figure was lower. These figures were based on the cost of completed buildings. However, the hangar and administration building at the airport were not completed until after 1946. Accordingly, the respondent's net worth statement allowed liabilities in the amount of $15,584.86, as of December 31, 1946, as an offset against the cost of the completed buildings. The sum of $15,584.86 was determined by respondent to be the amount of construction expenses paid by the petitioners after December 31, 1946. The petitioners oppose the respondent's use of the figures taken from their tax returns and Diffendall's affidavit. They claim these amounts were "estimates" made by Diffendall of the "worth" or value of the buildings, and were not of the "cost" of the structures. Samuel Kimmel prepared petitioners' returns for 1946, and he also represented Diffendall when the affidavit was executed. We are satisfied that Kimmel understood the distinction between "cost" and "value", and that when the affidavit was executed, he also understood the relevance of cost, as distinguished from value, in the determination of net income by the net worth method. The evidence establishes that the affidavit, *221 as first prepared, contained the identical figures as the tax returns for 1946, and that after an explanation of the net worth method by respondent's agents to Kimmel and Diffendall, and after a discussion between Kimmel and Diffendall, the "costs" of the structure at 8130 Eastern Avenue and of the airport hangar were each reduced by $2,000. It also appears that the petitioners were represented during the investigation by Samuel Weintraub, a certified public accountant, and that neither Weintraub nor Kimmel made any objections to the use in the net worth statement of the cost figures contained in the affidavit and tax returns. We are convinced, however, that Diffendall did not know the cost of these buildings, and that the figures supplied by him to Kimmel for the tax returns and for the affidavit were only his estimates of their "worth." With some reservation, we therefore do not consider the figures submitted under oath by Diffendall as conclusive. The petitioners have not introduced any bills, receipts, vouchers, canceled checks, or other documents from which the cost of the 5 structures can be determined. They rely on an appraisal prepared by their expert witness, John G. Arthur, *222 whose estimates were based upon the cost of constructing similar buildings, with new materials purchased at prices no greater than the lawful ceiling prices. Arthur estimated the construction costs as follows: addition at 8112 Eastern Avenue, $334.80; building at 8130 Eastern Avenue, $7,113.40; airport administration building, $18,648; airport hangar, $3,586.80; and airport beachhouse, $400. The petitioners also rely upon the results of an investigation made by respondent's agents among material suppliers in Baltimore. The agents endeavored to contact every supplier in the Baltimore area. They discovered purchases of building materials and services made by the petitioners from 1945 to 1949, inclusive, in the total amount of $29,257.57. As of December 31, 1946, only $13,041.20 of the total had been paid for materials and services used in the 5 structures. An additional payment of $826.70 had been made in 1946 on a purchase of corrugated metal which had a total cost of $2,504.95. This corrugated metal was not used in any of the 5 structures in question. The balance of the purchases discovered by respondent's agents, $15,389.67, were made after December 31, 1946, in connection with the *223 erection of the 5 buildings and other construction work being carried on by the petitioners. The petitioners claim that the cost appraisals prepared by Arthur demonstrate that the figures used by the respondent are erroneous. They contend that only the expenditures made on or before December 31, 1946, for materials used in the 5 buildings, namely $13,041.20, should be included in the net worth statement. They claim that this method eliminates the uncertainty involved in establishing their costs in the absence of books and records, and in determining the degree of completion, as of December 31, 1946, of the hangar and administration building. The petitioners claim no allowance for liabilities under their theory. We cannot accept as determinative of this issue the appraisals prepared by Arthur, which were based on his knowledge of the cost of similar buildings at ceiling prices. The evidence strongly suggests that the petitioners did not pay ceiling prices for all their materials. During the period involved, there was a shortage of certain types of building materials. Also, a system of building authorizations and priorities had been instituted under the Veteran's Emergency Housing *224 Act. Diffendall did not have the required permits and priorities to construct the buildings in question, and he admitted to the respondent's agents, during the investigation, that he had purchased materials on the black market. We likewise cannot accept the results of the agents' investigation among the material suppliers in Baltimore as determinative of the petitioners' construction expenditures. The results of this investigation are strongly relied upon by the petitioners as evidence of their maximum expenditures for materials. However, Diffendall did not testify that all of his purchases were discovered by the agents, and we are satisfied that the agents' compilation was not complete. For example, it does not reflect any purchases of cinder block, from which the walls of the biulding at 8130 Eastern Avenue and of the hangar and administration building were constructed; and it does not reflect any purchases of sheet rock, from which, according to Diffendall's testimony, the addition at 8112 Eastern Avenue was constructed. It is also appropriate to note that the petitioners' contention makes no allowance for labor costs. The construction work was done primarily by Diffendall and *225 other persons who were paid by Forrest. The petitioners made no attempt at the hearing of these proceedings to establish their labor costs. For the foregoing reasons, and upon the record, we reject petitioners' claim that their total construction costs should be limited to $13,041.20, the amount known to have been expended for materials on or before December 31, 1946. The questions involved under this issue are factual. We have considered the entire record, and our Findings of Fact constitute our best judgment as to the cost of each of the biuldings as of December 31, 1946. We have found that the petitioners' liabilities on December 31, 1946, did not exceed $11,163.13. This total consists of liabilities in the amount of $9,484.88 which were incurred in connection with the construction of the 5 buildings, and an additional item of $1,678.25, the balance due on a purchase of corrugated metal which the petitioners acquired in 1946 for purposes other than the construction of the buildings in issue. In his answers to the amended petitions, the respondent claimed that this latter liability should be eliminated from the net worth statement on the ground that the indebtedness was not incurred *226 in the construction of the buildings. It is not questioned that the petitioners owed this sum on December 31, 1946; there is no justification for eliminating it from the net worth statement; and respondent's contention is rejected. However, the evidence also establishes that the corrugated metal was not used in any manner during 1946, and that it was owned by the petitioners on December 31, 1946. The metal therefore should be included as an asset in the petitioners' not worth statement at its total cost of $2,504.94. The respondent's answers also allege that another liability for sheet metal in the amount of $1,674.38 should be eliminated from the net worth statement. We agree with respondent, for the reason that this second purchase of sheet metal was not made until after 1946 and the liability was not incurred until after 1946. We have also eliminated additional liabilities in the amount of $2,747.35 for the reason that they were not incurred until after 1946. These liabilities were incurred for cocktail bar equipment and cement which were used to complete the administration building. The liabilities were included in the respondent's net worth statement because the administration *227 building was included at its completed cost, instead of in an amount which included only costs incurred on or before December 31, 1946. The building should have been included in the net worth statement in an amount equal to the petitioners' cost as of December 31, 1946, as set forth in our Findings of Fact. The elimination of liabilities incurred after December 31, 1946, will not affect the net income shown on the net worth statement, for if these liabilities were to be included in the net worth statement, it would be necessary to add an identical amount, $2,747.35, to the cost of the building which is included among the petitioners' assets. Issue 5 - Capital Gain on Sale of Forrest in December 1946 The question to be decided under this issue is whether the petitioners realized capital gain in 1946 upon the sale of their Forrest business to Gittings, and if so, the amount thereof. The parties are agreed that no more than $5,823.45 of the $85,000 purchase price was paid for the equipment and machinery used in Forrest's business. This amount equals the adjusted basis of the equipment and machinery, and accordingly, no question of gain or loss is presented with respect to these *228 assets. The petitioners contend that of the balance of the purchase price, $79,176.55, no more than $14,500 was paid for Forrest's inventory, and that the remainder, $64,676.55, was paid for Forrest's goodwill. The petitioners claim that the Forrest inventory had an adjusted basis for gain or loss of $14,500; that no gain is to be recognized on the sale of the inventory; and that $64,676.55, allegedly paid for goodwill, less expenses of the sale in the amount of $2,800, or $61,876.55, constituted capital gain. Accordingly, they claim a deduction from their 1946 increase in net worth of $30,938.27, or 50 per cent of $61,876.55 in order to give effect to the alleged capital gain. The respondent concedes that any gain from the sale of goodwill would be capital gain. The petitioners agree that any gain from the sale of inventory would be ordinary income. The respondent contends that the entire purchase price other than $5,823.45 paid for machinery and equipment, or $79,176.55, was paid by Gittings for Forrest's inventory; that Gittings paid nothing for the goodwill of Forrest; and that the gain from the sale of Forrest's inventory is ordinary gain and must be taken into account in *229 1946 in toto without any adjustment for capital gain in the net worth statement. The sales agreement between Gittings and the petitioners does not allocate the purchase price among the inventory, machinery and equipment, goodwill, agreement to lease, and covenant not to compete. Petitioners' books do not contain any entries indicating a breakdown of the purchase price. The petitioners assert that the adjusted basis of $14,500 claimed for the Forrest inventory is established by an inventory of the Forrest premises made by Diffendall, Kimmel, and some unidentified Forrest employees on the day following the sale to Gittings. The petitioners' testimony indicated that Diffendall assigned to each of the 600 to 1,000 cars on Forrest's lot an amount, ranging up to $125, to reflect his judgment of the value of the remaining saleable parts. The total of $14,500 also includes an unspecified amount for glass and loose parts. It does not include any allowance for the assets Shapiro was most anxious to acquire, namely, the 300 or 400 tons of loose scrap metal on the lot, and the scrap metal remaining on the cars after the parts were stripped off. Also, petitioners' figure of $14,500 does not seem *230 to have included any amount for the 10 to 20 reusable cars on the Forrest premises. The evidence indicates that these cars could be sold for up to $1,500 each. We are not impressed with the estimates of the quantities or with the valuation reflected by this purported inventory, and we do not consider this inventory evidence which establishes the fair market value of Forrest's property at the time of the sale. Shapiro testified he paid $30 per ton for the loose scrap on the lot, and about $20 for the scrap remaining on each stripped car. Shapiro had extensive scrap metal interests in the Baltimore area. There was a shortage of scrap at this time, and before Gittings purchased Forrest's business, he had made several unsuccessful attempts to purchase only Forrest's scrap metal from the petitioners. That Shapiro was motivated in having Gittings purchase Forrest's business primarily to obtain the scrap metal is further evidenced by the resale of Forrest to the petitioners in August 1947, only eight months later. Before Forrest was resold to the petitioners, all the cars and loose scrap on the premises had been removed to United Iron and Metal Co., a Shapiro scrap metal enterprise. The *231 petitioners paid $35,000 to repurchase Forrest, and the evidence indicates that Forrest's machinery and equipment and a quantity of loose auto parts were resold with the business. We have considered all the evidence and we have found that Gittings paid at least $65,000 for the machinery, equipment, and inventory of Forrest, and no more than $20,000 for Forrest's goodwill. Issue 6. - Cash on hand on December 31, 1946 The respondent determined that the petitioners had $20,000 cash on hand on December 31, 1946. That sum is the entire $20,000 cash which they received from Gittings on December 4, 1946. The petitioners contend that Isabelle placed $5,000 of this $20,000 in their safety-deposit box, and that Diffendall disbursed the remaining $15,000 during December 1946 in the payment of various debts. The evidence shows that several liabilities were paid by the petitioners during December 1946 in cash, as set forth in the Findings of Fact. However, the total of these cash payments did not exceed $3,030.60. Other liabilities, totaling $1,466.60 were paid by check. The evidence does not support petitioners' contention that $15,000 was expended during 1946 and that only $5,000 was placed *232 in the safety-deposit box by Isabelle. The petitioners did not visit their safety-deposit box after December 5, 1946, when Isabelle admittedly placed therein some of the cash received on the previous day from Gittings, until August 11, 1947. On the latter date, the petitioners were obligated to make a down payment of $15,000 for the repurchase of Forrest. On the same day that Isabelle visited the safety-deposit box, on August 11, 1947, a deposit of $16,000 in cash was made to the petitioners' bank account. The petitioners made no effort to explain the source of this deposit. It appears that the $16,000 was taken from the safety-deposit box on the same day. Inasmuch as the box had not been entered since December 5, 1946, any cash in the box on August 11, 1947, would have been there on December 31, 1946. We conclude that the petitioners had $16,000 in undeposited cash on hand on December 31, 1946. Issue 7. - Living Expenses The parties have stipulated that the petitioners made certain expenditures during the taxable years for jewelry, appliances, clothing, and tuition. The amounts expended for these items are set forth in the Findings of Fact. In addition, the respondent determined *233 that the petitioners expended the sum of $2,600 in each of the taxable years for miscellaneous living expenses. The petitioners contend that the respondent's determination is excessive, and that their expenditures for living expenses did not exceed $1,300 in each of the taxable years. However, the evidence shows that the Diffendalls had two children during the taxable years. One of the children, Charles, Jr., died in October 1946. Isabelle admitted that her expenditures for food alone were approximately $25 per week or $1,300 per year. In addition to other customary expenditures for a family of four, which the petitioners do not deny were made, Diffendall purchased a small airplane in 1942 and maintained it for his personal use during the balance of the taxable period. We conclude that the petitioners have not established that the respondent's determination was erroneous, and we have found as a fact that their expenditures for living expenses were not less than $2,600 in each of the taxable years. There is no merit to the petitioners' claim that the utility expenses for their home should be excluded from expenditures for living expenses because these expenses were paid by check as *234 business expenses of Forrest. The petitioners next urge that all or a part of the cost of the fur coat purchased by Isabelle in 1946 should be excluded from the net worth statement because the coat was paid for in part with insurance proceeds received as a result of a fire at their farm. It is true that the insurance proceeds were not taxable income. However, the respondent allowed adjustments in the net worth statement to compensate for the inclusion of assets or expenditures into which the insurance proceeds might have been converted. For example, the respondent allowed a deduction in 1946 for the entire amount of the petitioners' personal property loss, $6,052.54, although the petitioners in fact recovered insurance proceeds of only $4,718.63, with respect to this loss. The real property at the farm was damaged in the amount of $6,500 by the fire. The petitioners were reimbursed by insurance in the full amount of this loss, and expended $2,500 of the recovery to make repairs to the property. Although they recovered their entire loss, the respondent reduced the basis of the property from $22,000 to $18,000, and thereby decreased their net worth in the amount of $4,000, because *235 the remaining $4,000 of their insurance recovery was available for expenditures, such as the coat purchase, which might show up in the net worth statement. We hold that the respondent did not err in his treatment of the purchase of the coat, or of the receipt of the insurance proceeds. The petitioners also contend that the bracelet purchased by Diffendall in 1945 for $4,000 should be excluded from expenditures for 1945 which are part of the net worth statement because Isabelle received it from him as a gift. There is no merit to this contention. The respondent has used a joint net worth plus expenditures statement which applies to both of the petitioners. If the item of $4,000 had been a gift to both Diffendall and Isabelle, it should be eliminated from the schedule of expenditures in 1945 which is appended to and made part of the net worth statement. However, that is not the fact, and the expenditure by Diffendall of $4,000 has been included properly in the expenditures for 1945. It is not material that one of the petitioners, Isabelle, was the "donee," so to speak, of the result of the expenditure. In his deficiency notices, the respondent determined that for 1946, Diffendall *236 and Isabelle realized taxable net income in the amounts of $59,247.57 and $57,571.26, respectively. In his answers, the respondent determined that Diffendall and Isabelle had taxable net income in 1946 in the amounts of $61,008.17 and $59,331.85, respectively. The respondent has the burden of proving the increases in taxable net income which he affirmatively pleaded. We hold that the respondent has failed to establish by competent proof that Diffendall and Isabelle had taxable net income in 1946 of $61,008.17 and $59,247.57, respectively. The respondent's determinations of the amounts of taxable net income realized by petitioners in the years 1943 to 1946, inclusive, are sustained to the extent of the amounts set forth in the Findings of Fact. Issue 8. - Fraud Penalties The question under this issue is whether all or a part of the deficiencies in each of the taxable years is due to fraud with intent to evade tax. On this issue, the respondent has the burden of proof, and the evidence must be clear and convincing. M. Rea Gano, 19 B.T.A. 518. During the 3 year period, 1944 *237 to 1946, inclusive, the petitioners reported taxable income of $66,577.11. In the same period they had unreported taxable income in excess of $140,000. Their repeated and continuous understatements of net income in substantial amounts are strong evidence of a fraudulent intent to evade tax. Rogers v. Commissioner, 111 Fed. (2d) 987, affirming 38 B.T.A. 16; Arlette Coat Co., 14 T.C. 751. In each of the years 1944 to 1946, the petitioners made cash expenditures and increased their bank deposits in amounts far in excess of the amounts of net income reported on their returns. For example, in the year 1944, for which they reported net income of $11,724.85, they handled cash totaling $58,200 as follows: they spent more than $32,000 to buy their farm; paid off a mortgage of more than $2,400; paid more than $21,500 for life insurance premiums; and increased their bank balances by more than $2,300. In 1945, for which they reported income of $18,738.18, they spent, at least, $54,700, as follows: they purchased the airport property and 8130 Eastern Avenue for *238 more than $42,000 in cash; paid Federal income taxes of more than $4,900; purchased a diamond bracelet for $4,000; and clothing in excess of $3,800. In 1946, they reported net income of $36,114.08, but they handled cash of about $112,300, as follows: they increased their bank balances by more than $56,000; purchased an automobile, 2 tractors and a scoop for more than $17,000; constructed buildings at the airport and on Eastern Avenue at a cost of more than $23,000, excluding liabilities of $9,484.88 outstanding on December 31, 1946; purchased a beauty salon for more than $3,400; paid Federal income taxes of more than $5,500; and purchased a mink coat and other clothing at a cost in excess of $7,400. In addition, they made other, smaller expenditures during these years and paid their general living expenses, as set forth in the Findings of Fact. In the absence of evidence which establishes petitioners' contention that these expenditures were for the most part made from cash accumulated prior to December 31, 1941, it is apparent that the petitioners accumulated cash after 1941 in amounts greatly in excess of the net income which was reported. Upon the evidence, it has been found that *239 petitioners, for 1944, 1945, and 1946, had income in the amount of $140,725.11, which was not reported in their returns for those years. As shown above, the petitioners spent or handled cash in the period 1944-1946, inclusive, in an amount which was in excess of the net income which they reported in their returns to the extent of at least $158,622.89. Their cash expenditures, which were in excess of their reported income, in the absence of proof that they had an accumulation of savings and gifts at the end of 1941, or 1942, or 1943, in an amount equal, or nearly equal, to their cash expenditures are persuasive evidence that the petitioners wilfully, deliberately, and fraudulently concealed and failed to report their true taxable net income in each of the years 1944, 1945, and 1946. The petitioners' principal contention is that as of the end of 1941, they had saved $70,000 or $75,000 out of the earnings of their business, Forrest. They assert that from all sources they had $80,000 or $85,000 at the end of 1941. Such alleged accumulation of money is said to be the source of their large expenditures. It is also argued that the existence of the purported fund destroys the validity of *240 respondent's net worth statement. Petitioners have denied that there were the increases in net worth in each of the years covered by the respondent's net worth statement. However, upon careful consideration of all of the evidence, the inescapable conclusion is that petitioners' explanations of the alleged sources of the large amount of money which they handled and spent are unworthy of belief, are in part untrue and inaccurate, and are on the whole entirely unacceptable. Both of the petitioners have made inconsistent statements, and furthermore, some of their statements have been shown to be false. Their contention that they had about $85,000 of savings at the end of 1941 is not supported by competent evidence. The record before us strongly indicates that it was practically impossible for the petitioners to have saved as much as $85,000 during years prior to 1942. The record provides no evidence about the net income of the petitioners prior to 1937; no income tax returns were filed for years prior to 1937. The evidence shows that during the years 1937-1941, inclusive, the petitioners spent at least the aggregate sum of $34,080.79, exclusive of living expenses, and that they reported *241 in their returns for the same period total net income of only $37,553.19. Upon such facts, it is difficult to find that petitioners had any substantial amount of savings at the end of 1941, and there is no credible evidence which establishes that they received money through gifts or inheritance prior to 1941. At the very most, the petitioners had $12,500 at the end of 1941, and no more. It has been found that the petitioners' savings amounted to the above amount at the end of 1941 only by resolving a good many doubts in petitioners' favor. That finding reflects a most liberal construction of the evidence before us. Testimony about counting currency is entitled to little weight. In fact, the testimony that currency was counted at the end of 1941, when Diffendall's draft status was changed, stands contradicted by evidence that Diffendall was classified as class 1 or 1-A by the Selective Service for the first time in December 1943 rather than in December 1941. The petitioners rely primarily upon their own testimony which is self-serving and is not sufficiently corroborated. This Court is *242 not obliged to believe self-serving testimony which is insufficiently corroborated and inherently implausible. Carmack v. Commissioner, 183 Fed. (2d) 39, certiorari denied, 340 U.S. 875; Burka v. Commissioner, 179 Fed. (2d) 483. The respondent has shown that Isabelle has made untrue statements. The maxim "falsus in uno, falsus in omnibus" may be a harsh rule, but application thereof here is justified, and, therefore, we are unable to believe much of the testimony of Isabelle. We have taken into account the fact that neither petitioner had much formal education, and that Diffendall is handicapped by his lack of ease and quickness in reading, and his inability to understand the meaning of some words. It appears that his vocabulary is quite limited. Nevertheless, we are unable to believe that either of the petitioners did not know the true extent of their income, or that either was unaware of the disparity between their actual income in each of the taxable years and their reported income. Both have demonstrated ability to make money, their readiness *243 to spend money, and their desire to acquire profits and property. It puts too great a strain upon the credulity of the Court, under all of the circumstances, to accept as true the petitioners' claim of innocence and lack of any intention to evade taxes. The inference which must be drawn from all of the lengthy record is that the petitioners had a fraudulent intent in failing to report substantial amounts of income for 1944, 1945, and 1946. It is held that the respondent has sustained his burden of proving that part of each deficiency for 1944, 1945, and 1946 was due to fraud with intent to evade tax. The 50 per cent additions to the deficiencies for those years are sustained. On the other hand, it is concluded that there is not clear and convincing proof of fraud with respect to the year 1942. Unless the deficiency for 1942 was due to fraud, the deficiency is barred. Under this holding, the deficiency for 1942 is barred. For 1943, it has been found that petitioners' income was understated in the amount of $3,471.67. Fraud is not established by mere understatement of income. Understatement of income may be due to negligence rather than fraud. With respect to the year 1943, it *244 is concluded that there is not clear and convincing evidence of fraud. Accordingly, unless the deficiency for 1943 is barred, in which event both the deficiency and the 50 per cent fraud penalty fall, it is held that the fraud penalty has been improperly added to the 1943 tax deficiency. Issue 9. - Statute of Limitations The remaining question to be decided is whether the deficiency for 1943 is barred by the statute of limitations. The deficiency notice was mailed more than 3 years and less than 5 years after the return for 1943 was filed. The respondent contends that the provisions of section 275(c) of the 1939 Code apply because, he alleges, the petitioners omitted from gross income an amount properly includible therein which was in excess of 25 per cent of the amount of gross income stated in their return. [2]
*245 In their 1943 return, the petitioners reported gross income from their Forrest business and from rents and royalties. Gross income for the type of business carried on by Forrest means total sales, less the cost of goods sold, plus income from investments and from incidental or outside sources. H. Leslie Leas, 23 T.C. 1058 (March 24, 1955), Regs. 111, section 29.22(a)-5. [3] The gross income reported from Forrest, as set out in Schedule C(2) of the petitioners' return, was $13,002.65. The petitioners also reported gross income from rents and royalties of at least $1,004.35, or a total gross income of $14,007. Twenty-five per cent of this amount is $3,501.75. Upon the evidence, the Court has found that the petitioners understated their taxable net income for 1943 in the amount of $3,471.67. An understatement of taxable net income, as determined by the net worth plus expenditures method, may result either from omissions of gross income or from overstatements of deductions, or both. See H. A. Hurley, 22 T.C. 1256, (on appeal, (T), C.A. 6). The understatement of taxable net income in this case, as determined by the net worth plus expenditures method, is $3,471.67, *246 or less than 25 per cent of the gross income stated in petitioners' return. Therefore, even if this understatement of taxable net income were entirely attributable to omissions from gross income, the amount of gross income so omitted would not constitute 25 per cent of the gross income stated in the return. The respondent, who raised the question by affirmative pleadings in his answer, has the burden of proof on this issue. He has failed to prove that section 275(c) of the 1939 Code applies. It is held that the deficiency for 1943 is barred by the statute of limitations. *247 Decisions will be entered under Rule 50. Footnotes
1. The respondent has determined by his answers that for 1946, Diffendall's taxable net income amounted to $61,008.17, and Isabelle's amounted to $59,247.57.↩
*. Individual returns were filed by petitioners for 1945 and 1946. The net worth statement is a joint net worth statement. The [amounts] of the net income per returns for 1945 and 1946, of the petitioners, have been combined, for convenience, in the above table, and the total amounts of the unreported income of the petitioners for 1945 and 1946, also, have been combined in the above table.↩
2. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
3. REGULATIONS 111 (1943 Edition). Sec. 29.22(a)-5. Gross Income from Business. - In the case of a manufacturing, merchandising, or mining business, "gross income" means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources. In determining the gross income subtractions should not be made for depreciation, depletion, selling expenses, or losses, or for items not ordinarily used in computing the cost of goods sold. But see section 29.23(m)-1(f).↩